FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

MAY 1 2 2008

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| RICHARD CHURCHWELL, | No. CV 06-4646-GAF (AGR) |
| Petitioner, | |
| v. | ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |
| WARDEN JAMES E. TILTON, | |
| Respondent. | |

Pursuant 28 U.S.C. § 636, the Court has reviewed the entire file de novo, including the Petition, all the records and files herein, the Magistrate Judge's Report and Recommendation, and the objections to the Report and Recommendation that have been filed herein.  Having made a de novo determination, the Court agrees with the recommendation of the Magistrate Judge.

IT IS ORDERED that Judgment be entered denying the Petition and dismissed this action with prejudice.

DATED: _____5/7/08_____

_____
GARY A. FEESS
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

RICHARD CHURCHWELL,                    )    NO. CV 06-4646-GAF (AGR)
                                       )
              Petitioner,              )
                                       )
        v.                             )
                                       )    REPORT AND RECOMMENDATION
WARDEN JAMES E. TILTON,                )    OF UNITED STATES MAGISTRATE
                                       )    JUDGE
              Respondent.              )
                                       )
_____

        The Court submits this Report and Recommendation to the Honorable Gary

A. Feess, United States District Judge, pursuant to 28 U.S.C. § 636 and General

Order No. 05-07 of the United States District Court for the Central District of

California. For the reasons set forth below, the Magistrate Judge recommends that

the Petition for Writ of Habeas Corpus be denied.

1

**I.**

2

## SUMMARY OF PROCEEDINGS

3    On November 20, 2001, a jury in Los Angeles County convicted Petitioner

4    of one count of sexual penetration by a foreign object in violation of California

5    Penal Code § 289(a)(1) (count 1), one count of attempted forcible oral copulation

6    in violation of Penal Code §§ 664/288a(c)(2) (count 2), one count of forcible oral

7    copulation in violation of Penal Code § 288a(c)(2) (count 3), and two counts of

8    forcible rape in violation of Penal Code § 261(a)(2) (counts 4 and 5); the jury also

9    found true that Petitioner used a dangerous or deadly weapon, a box cutter, in

10   the commission of these offenses.  (CT 164-68, 171-73.)[1]  Petitioner was

11   sentenced to a total term of 21 years to life in state prison.  (CT 213-15.)

12    Petitioner appealed to the California Court of Appeal, which reversed his

13   rape convictions, vacated his sentence for forcible oral copulation, and remanded

14   the matter for further proceedings and re-sentencing in an unpublished opinion

15   filed May 12, 2003.  *People v. Churchwell*, 2003 WL 21054793 (2003) (Lodged

16   Documents ("LD") 1-6.))  On June 13, 2003, Petitioner filed a petition for review in

17   the California Supreme Court.  (LD 7.)  On July 16, 2003, the Supreme Court

18   denied review.  (LD 8.)  On July 14, 2003, Petitioner was re-sentenced to a total

19   term of 15 years to life in state prison.  (LD 9.)

20    On July 16, 2004, Petitioner filed a habeas corpus petition in the Los

21   Angeles County Superior Court, which denied the petition on January 12, 2005,

22   and re-denied it on May 1, 2006.  (LD 10-16.)  On March 11, 2005, petitioner filed

23   a habeas petition in the California Court of Appeal.  (LD 17-18.)  On April 18,

24   2005, the Court of Appeal denied the petition.  (LD 19.)

25    On May 17, 2005, Petitioner filed his first California Supreme Court

26   habeas petition, which was denied on April 26, 2006.  (LD 20-22.)  On August 3,

27   _____

28    [1]  "CT" refers to the Clerk's Transcript.

1   2006, Petitioner filed his second California Supreme Court habeas petition. (LD
2   23-25.) On February 21, 2007, the Supreme Court denied the second petition,
3   citing *In re Robbins* 18 Cal. 4th 770, 780, 77 Cal. Rptr. 2d 153 (1998), and *In re*
4   *Clark* 5 Cal. 4th 750, 21 Cal. Rptr. 2d 509 (1993). (LD 26.)

5          Pursuant to 28 U.S.C. § 2254, Petitioner filed a Petition for Writ of Habeas
6   Corpus by a Person in State Custody on July 26, 2006. On October 16, 2006,
7   Respondent filed a Return, in which he argued that the petition was untimely and
8   unexhausted. (Return at 2.) On October 25, 2006, Magistrate Judge Stephen J.
9   Hillman issued a minute order which rejected the time bar argument and ordered
10  Respondent to file a notice specifying which claims alleged in the Petition are
11  unexhausted. On November 3, 2006, Respondent filed a Notice Regarding
12  Exhaustion, in which he claimed that Grounds Five, Seven, and Nine of the
13  Petition were unexhausted. After briefing by the parties addressing good cause
14  for failure to exhaust the three claims, the Court found on December 13, 2006,
15  that Petitioner failed to demonstrate good cause and advised him of his options.
16  On December 28, 2006, Petitioner filed a notice of withdrawal of Grounds Five,
17  Seven, and Nine.

18         On May 29, 2007, Respondent filed a Supplemental Return ("Supp.
19  Return"), which admitted that the remaining grounds are exhausted, are not
20  barred by the non-retroactivity doctrine set forth in *Teague v. Lane*, 489 U.S. 288,
21  310, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), *limited by Lockhart v. Fretwell*,
22  506 U.S. 364, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993), and the Petition is timely.
23  (Supp. Return at 2.) Petitioner filed a Reply to the Supplemental Return ("Reply")
24  on June 28, 2007.

25         The following are the remaining eight grounds of the Petition: (1)
26  prosecutorial misconduct; (2) *Brady*[2] evidence; (3) prosecutorial argument in

27  _____

28      [2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).



1 | closing argument; (4) ineffective assistance of counsel for failing to investigate
2 | and produce phone records; (6) ineffective assistance of counsel for failing to
3 | object to prosecutorial misconduct in closing argument, failing to ask for
4 | continuance for untimely disclosure of complaining witness' workers'
5 | compensation claim, and failing to present all phone bills; (8) ineffective
6 | assistance of counsel for failing to object to the prosecutor's comments in closing
7 | argument regarding potential civil suit by complaining witness; (10) ineffective
8 | assistance of counsel for failing to investigate and present exculpatory evidence;
9 | and (11) ineffective assistance of counsel for failing to object to hearsay
10 | evidence, failing to cross-examine civil attorney about collateral estoppel, and
11 | failing to ask for a continuance.

12 |          This matter has been taken under submission and is now ready for
13 | decision.

14 |                                  II.

15 |                       **STATEMENT OF FACTS**

16 |          Below are the facts set forth in the California Court of Appeal decision.[3]
17 | To the extent an evaluation of Petitioner's claims for relief depends on an
18 | examination of the record, the Court has made an independent evaluation of the
19 | record specific to Petitioner's claims for relief.

20 |          Elsie M. worked a night shift at Southwest Offset Printing.  Petitioner was
21 | her supervisor.  In May 2001, Elsie reported to work at 8:00 p.m.  Petitioner told
22 | her that she would be working in a building across the street and, because it was
23 | not her normal work location, he would drive Elsie there.

24 |          Instead, Petitioner drove Elsie to a deserted parking lot.  They both got out
25 | of the car.  Petitioner told Elsie that he wanted to have sex with her.  Elsie
26 | refused and started to walk away.  Petitioner grabbed her by her blouse and

27 | _____



28 |          [3] *Churchwell*, 2003 WL 21054793 at *1-2.

1  pulled her close to him, causing the buttons on her blouse to rip off.  He displayed

2  a box cutter and said he could cut her throat and no one would notice.  Elsie was terrified.

3     When Elsie continued to resist his advances, Petitioner said he "wasn't

4  playing around," pulled her pants down, and committed sexual acts including

5  penetration with his fingers.  He grabbed a bed sheet from his car, put it on the

6  ground, and told Elsie to lie down.  She initially refused but, when Petitioner

7  repeated that he was not playing around, she complied.  Petitioner orally

8  copulated her and committed two acts of rape while she was lying on the ground.

9     Petitioner told Elsie that he was going to leave her at a nearby fast food

10  restaurant where she could call her family for a ride.  He told her not to tell

11  anyone, especially coworkers, about the sexual attack.  Petitioner took Elsie to

12  the restaurant and left her.  She started walking back to the Southwest Offset

13  Printing plant.  On the way, she used her cell phone to call coworker Eddie Harris

14  at his home.  In hysterics, she told Harris what had happened to her.  She asked

15  Harris to telephone another coworker, Jerry Babcock, who was at work at the

16  time and ask Babcock to come outside to help her.  Harris did so.  Babcock left

17  the plant and found Elsie outside.  Elsie told Babcock that Petitioner had raped

18  her.  She was crying, her hair was messed, and her blouse was open. Another

19  coworker called the police.

20     The police arrived, questioned Elsie, and arrested Petitioner.  Elsie was

21  taken to the hospital where nurse Susan Gorba performed a rape examination.

22  Gorba testified that Elsie had injuries consistent with rape.

23     Petitioner testified on his own behalf.  He testified that he and Elsie had

24  been dating for two or three months and had a romantic relationship.  She told

25  him that she was separated from her husband.  Petitioner testified that, on the

26  night of the incident, he and Elsie met outside the Southwest Offset Printing

27  premises. Elsie got into Petitioner's car, and they drove to the same parking lot

28  that Elsie had identified as the scene of the incident.  Petitioner testified that,



1  although there was no sexual intercourse, he and Elsie engaged in other

2  consensual sexual activity on the blanket.

3      Petitioner testified that, on the way back to the plant, Elsie got out of the

4  car and walked the remainder of the way.  She told Petitioner that she did not

5  want to be seen with him by coworkers.  Petitioner parked and went into his

6  office. Twenty minutes later, the police arrested him.

7                                       III.

8                          **STANDARD OF REVIEW**

9      A federal court may not grant a petition for writ of habeas corpus by a

10  person in state custody with respect to any claim that was adjudicated on the

11  merits in state court unless it (1) "resulted in a decision that was contrary to, or

12  involved an unreasonable application of, clearly established Federal law, as

13  determined by the Supreme Court of the United States"; or (2) "resulted in a

14  decision that was based on an unreasonable determination of the facts in light of

15  the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d);

16  *Woodford v. Visciotti*, 537 U.S. 19, 21, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002)

17  (per curiam); *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836

18  (2007).

19      "'[C]learly established Federal law' . . . is the governing legal principle or

20  principles set forth by the Supreme Court at the time the state court rendered its

21  decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed.

22  2d 144 (2003).  A state court's decision is "contrary to" clearly established

23  Federal law if (1) it applies a rule that contradicts governing Supreme Court law;

24  or (2) it "confronts a set of facts . . . materially indistinguishable" from a decision

25  of the Supreme Court but reaches a different result. *Early v. Packer*, 537 U.S. 3,

26  8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

27      Under the "unreasonable application prong" of section 2254(d)(1), a federal

28  court may grant habeas relief "based on the application of a governing legal



6

1  principle to a set of facts different from those of the case in which the principle

2  was announced." *Lockyer*, 538 U.S. at 76; *see also Woodford*, 537 U.S. at 24-26

3  (state court decision "involves an unreasonable application" of clearly established

4  federal law if it identifies the correct governing Supreme Court law but

5  unreasonably applies the law to the facts).

6      A state court's decision "involves an unreasonable application of [Supreme

7  Court] precedent if the state court either unreasonably extends a legal principle . .

8  . to a new context where it should not apply, or unreasonably refuses to extend

9  that principle to a new context where it should apply." *Williams v. Taylor*, 529

10  U.S. 362, 407, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

11      "In order for a federal court to find a state court's application of [Supreme

12  Court] precedent 'unreasonable,' the state court's decision must have been more

13  than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct.

14  2527, 156 L. Ed. 2d 471 (2003) (citation omitted).  "The state court's application

15  must have been 'objectively unreasonable.'" *Id.* (citation omitted); *see also*

16  *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 161 L. Ed. 2d 334 (2005).

17      "[S]tate court factual findings are presumed correct in the absence of clear

18  and convincing evidence to the contrary." *Mitleider v. Hall*, 391 F.3d 1039, 1046

19  (9th Cir. 2004), *cert. denied*, 545 U.S. 1143 (2005); *see also Miller-El v. Cockrell*,

20  537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ( "Factual

21  determinations by state courts are presumed correct absent clear and convincing

22  evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits

23  in a state court and based on a factual determination will not be overturned on

24  factual grounds unless objectively unreasonable in light of the evidence

25  presented in the state-court proceeding, § 2254(d)(2).").  *Id.* at 324.

26      In applying these standards, this Court looks to the last reasoned state

27  court decision. *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006).  To the

28  extent no such reasoned opinion exists, as when a state court rejected a claim in



1  an unreasoned order, this Court must conduct an independent review to
2  determine whether the decisions were contrary to, or involved an unreasonable
3  application of, "clearly established" Supreme Court precedent. *Delgado v. Lewis*,
4  223 F.3d 976, 982 (9th Cir. 2000). If the state court declined to decide a federal
5  constitutional claim on the merits, this Court must consider that claim under a *de*
6  *novo* standard of review rather than the more deferential "independent review" of
7  unexplained decisions on the merits authorized by *Delgado*. *Lewis v. Mayle*, 391
8  F.3d 989, 996 (9th Cir. 2004) (standard of *de novo* review applicable to claim
9  state court did not reach on the merits).

10  Here, the California Supreme Court reached the merits of Ground Eleven
11  when it denied Petitioner's petition for review without comment or citation to
12  authority. *Gaston v. Palmer*, 417 F.3d 1030, 1038 (9th Cir. 2005), *amended* 447
13  F.3d 1165 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 979 (U.S. 2007); *Hunter v.*
14  *Aispuro*, 982 F.2d 344, 348 (9th Cir. 1992), *cert. denied*, 510 U.S. 887 (1993). Its
15  denial is presumed to rest upon the same grounds as those discussed in the
16  opinion of the California Court of Appeal, which is the last reasoned state court
17  decision with respect to that ground. *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111
18  S. Ct. 2590, 115 L. Ed. 2d 706 (1991). Thus, in addressing Ground Eleven, this
19  Court will consider the California Court of Appeal's opinion. *Davis*, 443 F.3d at
20  1158. The California Supreme Court also denied Grounds Two, Four and Ten on
21  the merits when it denied Petitioner's first habeas corpus petition filed in that
22  court without analysis or citation. *Gaston*, 417 F.3d at 1038; *Hunter*, 982 F.2d at
23  348. However, since there is no reasoned decision addressing those claims, this
24  Court must conduct an independent review to determine whether the denial was
25  contrary to, or involved an unreasonable application of, "clearly established"
26  Supreme Court precedent. *Delgado*, 223 F.3d at 982.

27  Ground Eight was denied on the merits by the California Court of Appeal
28  on direct review, and the deference afforded by AEDPA extends to the decision

8

1 | of that lower court. *See Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir.),

2 | *cert. denied*, 128 S. Ct. 532 (2007); *Hirschfield v. Payne*, 420 F.3d 922, 926-27

3 | (9th Cir. 2005). Ground One was denied on habeas review by the Los Angeles

4 | County Superior Court when that court issued a summary denial. *Gaston*, 417

5 | F.3d at 1038; *Hunter*, 982 F.2d at 348. AEDPA deference applies to that denial,

6 | but this Court must apply independent review because there is no reasoned

7 | decision addressing that ground. *Delgado*, 223 F.3d at 982. *De novo* standard of

8 | review applies to the remaining grounds – Grounds Three and Six–because no

9 | state court has addressed them. *Lewis*, 391 F.3d at 996.[4]

10 | **IV.**

11 | **DISCUSSION**

12 | **A.  GROUNDS ONE AND THREE: Prosecutorial Misconduct in**

13 | **Closing Argument**

14 | In Ground One, Petitioner contends the prosecutor committed misconduct

15 | in closing argument in stating that no civil suit had been filed and that an acquittal

16 | would not prevent a successful civil suit by Elsie. (Petition at 4.) In Ground

17 | Three, Petitioner claims that the prosecutor's closing argument violated

18 | Petitioner's right to due process in stating that Petitioner should have presented

19 | telephone records to corroborate his testimony that Elsie called him on numerous

20 | _____

21 | [4] Petitioner presented these remaining claims to the California Supreme
Court in his second habeas corpus petition filed in that court. However, that
22 | habeas petition was rejected as untimely. The California Supreme Court's
"summary order cites the very page of *Robbins* that sets forth 'the basic analytical
23 | framework' governing California's timeliness determinations in habeas corpus
proceedings." *Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007). The Court
24 | also cited *Clark*, which stated that, "the general rule is still that, absent
justification for the failure to present all known claims in a single, timely petition
25 | for writ of habeas corpus, successive and/or untimely petitions will be summarily
26 | denied." *In re Clark*, 5 Cal. 4th 750, 797, 21 Cal. Rptr. 2d 509 (1993). AEDPA
deference does not apply to the California Supreme Court's order. *See Pirtle v.*
27 | *Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002), *cert. denied*, 539 U.S. 916
28 | (2003).

occasions, called his ex-wife as a witness to support his claim that Elsie wrote

him two love letters, and presented DNA evidence. (Petition at 5; Memo at 9-

11.)[5]  Neither ground has merit.

### 1. Factual Background

### Contemplated Civil Suit

After an incident in April 2001, in which Petitioner called Elsie to his office

and gave her red underwear as a present, a coworker, Maria Recinos, suggested

that Elsie consult an attorney. (RT 649:11-651:26.)[6]  Recinos found an

employment attorney, Lee Miller, in the phone book. (RT 651:27-652:3, 902:14-

18.) Elsie and Recinos went to see Miller in April 2001. (RT 652:4-10, 653:20-

654:4, 903:23-28.) A month or a month and a half later, Miller received a

telephone call from Elsie, who told him she had been raped. (RT 904:9-14.)

During Elsie's cross-examination, defense counsel asked whether Elsie

was still in contact with Miller, and she responded in the affirmative. (RT 969:20-

22.) Defense counsel asked whether Miller was helping her file a lawsuit against

Southwest Offset Printing, and Elsie replied, "There is no suit yet." (RT 969:23-

25.) When asked whether she intended to file a lawsuit, she responded, "I don't

know." (RT 969:26-27.)

After the prosecution presented several witnesses, including Miller and

Elsie, the following exchange occurred between the trial court, the prosecutor,

and defense counsel, outside the jury's presence, regarding Elsie's workers'

compensation claim and contemplated civil lawsuit:

> The Court: . . . A moment ago off the record, counsel for the prosecution
>
> let everyone know that he had further conversation with the victim witness

---

[5] "Memo" refers to the memorandum that Petitioner attached to the pending petition.

[6] "RT" refers to Reporters' Transcript.



1  in this case and that, in fact, there is a workers' comp claim pending and

2  that she's been off work since the day of this incident and in addition to

3  those things, is receiving psychological counseling as it relates to this

4  incident.

5      [The prosecutor]: Yes.

6      The Court: That was told to us sort of vis-a-vis her testimony that she

7  and her attorney have not yet decided whether or not to file a lawsuit.

8      [The prosecutor]: There's two attorneys basically, Your Honor. [¶] There

9  is a possible sexual harassment lawsuit. We've heard from Mr. Miller on

10  that issue. There was a possible workmen's compensation issue that was

11  discussed at 402 hearings,[7] vis-a-vis the phone records which counsel

12  subpoenaed. [¶] I spoke to the victim because that was never really

13  addressed with her on the stand. Counsel didn't bring a 402 to try to

14  introduce that information. I spoke to her this morning just to confirm it

15  because I wasn't sure if she, in fact, had or had not filed a claim. [¶] What

16  she told me is the following: She hasn't worked since the incident. She's

17  seeing a psychotherapist and she has received payments since she's

18  been off. [¶] So my thought was that possibly that's *Brady* information I

19  should make available to Court and counsel. It's my understanding

20  counsel, as a matter of tactics, is not going to put that in front of the jury.

21      The Court: Further, that plaintiff's counsel had offered to stipulate to all

22  those things and the defendant declined and is going to proceed on the

23  state of the evidence as it exists.

24      [Defense counsel]: That's the defendant's understanding.

25      (RT 1501:17-1502:24.)

26  _____



27      [7] California Evidence Code § 402(b), provides, in pertinent part, that "[t]he

[trial] court may hear and determine the question of the admissibility of evidence

28  out of the presence or hearing of the jury; . . ."

1    During his closing argument, the prosecutor argued:

2    What's the next smoking gun that he'll try to claim shows a reasonable

3    doubt here?  Well, there was this thing about the lawyer and the possibility

4    of a lawsuit; right?  Is this fair game for you to think about?  Absolutely.  It

5    sure is, but think about it.  Think it through.  Start with the basics.  [¶]  Why

6    do people go to lawyers?  Because they're nice people?  Most people

7    hate lawyers.  People go to lawyers for a reason normally, because they

8    have been wronged.  So because she went to a lawyer doesn't make her,

9    per se, a not credible witness.  [¶]  Well, is this a dialing for dollars

10    situation?  Is she making this up to make some money on a civil lawsuit?

11    He may argue.  I'd say no.  **No lawsuit has been filed**.  [¶]  In your case,

12    in your verdict forms, you will not see any verdict form for damages.  We

13    find him guilty, furthermore, we order he pay a million bucks to Elsie

14    Montano.  Damages is not what you're about.  This is not about money

15    here.  [¶]  ***Moreover, what you do here, with all due respect, doesn't***

16    ***have that much bearing on what happens down the road in a civil***

17    ***context.***  You may think she's got to win the criminal case in order to win

18    the civil case for money.  Not true.  We can all think of one very famous

19    case in the last ten years where the defendant was acquitted, went down

20    to a smoke stack in civil court, can't we.  The Simpson case.  Apples and

21    oranges.  They're not related.  So because she has spoken to an attorney

22    should not make you question her credibility.  If anything, it corroborates

23    her.  It corroborates that she was being harassed and she cried out for

24    help.

25    (RT 2433:1-2434:4 (emphasis added).)

26    The defense, on the other hand, argued there was "evidence that [Elsie]

27    was playing [Petitioner] along for a sexual harassment case."  (RT 2453:10-12.)

28

**Telephone Calls**

1

2      On direct examination, Elsie testified that, before the alleged rape,

3  Petitioner sometimes slipped her pieces of paper with telephone numbers on

4  them and told her to call him. (RT 917:10-22.) Elsie spoke to him twice. (RT

5  917:23-27.) The first time, she telephoned Petitioner because he told her she

6  had done a job poorly, that he would be meeting with the department manager

7  about it, and she should call Petitioner the next day to find out what happened.

8  (RT 917:28-918:7.) Elsie telephoned Petitioner the second time because a friend

9  of hers, Concepcion Cisneros, wanted a job. (RT 918:8-19.) The prosecutor

10  asked whether Elsie had called Petitioner on another occasion, and she replied,

11  "No, twice. But once he wasn't there," so she hung up that time. (RT 918:20-24.)

12

13      Petitioner testified that he and Elsie began dating in March 2001 and had

14  a romantic relationship. (RT 1539:15-1540:11, 1543:12-24.) Petitioner gave her

15  his pager number, his cellular phone number, and another number for his

16  message line. (RT 1541:13-1542:7.) He testified that Elsie paged him, he called

17  her back, and they had several long conversations. (RT 1556:2-13.) Certain

18  telephone records were admitted into evidence as a defense exhibit. (RT

19  1503:19-1505:4; CT 79-80.)

20      Cisneros, a prosecution witness, testified that she occasionally did

21  housecleaning for Elsie, and found some papers in a drawer with phone numbers

22  and the name Rick on them. (RT 974:9-975:23.) She knew that the supervisor

23  whom Elsie had called to get Cisneros a job was named Rick,[8] and Cisneros

24  called Rick herself because she got the impression that Elsie did not want to get

25  her a job. (*Id.*) Cisneros testified that she called about three times. (RT 975:24-

26  26.) On cross-examination, Cisneros, who did not speak English, testified that

27  _____

28      [8] Elsie called Petitioner Rick. (RT 908:23-909:5.)



13

1  she hung up the first time she called because the person on the other end of the

2  line spoke English.  (RT 975:15-16, 978:23-979:2.)  She testified that she told the

3  prosecutor about her phone calls the day before she testified because that same

4  day Elsie and her husband were going over phone records and discussed who

5  had placed calls to a certain area code.  (RT 976:13-977:16.)  Cisneros testified

6  she was in the kitchen during the discussion and she interjected by saying she

7  had made some of those phone calls.  (*Id.*)

8        During his closing argument, defense counsel argued that there was a big

9  discrepancy between the number of calls in the phone records and Elsie's

10  testimony that she made a couple of phone calls to Petitioner.  Defense counsel

11  also argued that it was up to the jury to determine whether Cisneros was lying.

12  "But if you do not believe Ms. Cisneros [sic] story, if you believe that she was

13  lying, then you must also believe that Elsie [] enlisted her to lie to you."  (RT

14  2440:27-2441:27.)

15        The prosecutor made the following comment regarding the telephone calls

16  during his closing argument:

17        The next possible claim of impeachment, if you will, as to [Elsie] relates

18        to the phone calls.  Well, she called him.  There's no dispute.  She

19        called him in April.  She called him and she told you on the stand

20        because on one occasion there was a problem on the job and another

21        occasion she was looking for a job for her friend, Ms. Cisneros.  Ms.

22        Cisneros testified and told you that she also called to look for work.  He

23        wasn't there so she hung up.  There's no dispute there.  [¶]  What

24        would be interesting is this: in his testimony, [Petitioner] said, well, she

25        paged me, I'd call her back and those are the love conversations.

26        Those are the way, presumably, to talk. ***Where is his phone bill?***

27        ***You want to prove conversation in a love affair, you'd think you'd***

28        ***put those in evidence.***  We don't have that phone bill because it didn't



1    happen that way and it's just argument on the part of the defense

2    counsel.  The phone calls are innocuous and they do not cast

3    reasonable doubt on this case or the credibility of [Elsie].

4   (RT 2434:14-2435:4 (emphasis added).)

5   **Love Letters**

6        Elsie testified that Petitioner told her he loved his wife very much, but she

7   did not love him and treated him badly.  (RT 913:18-28.)  Petitioner asked Elsie to

8   write a note "someplace where his wife could see it" to get her attention.  (RT

9   914:3-12.)  Elsie wrote a note because she wanted to keep her job and was

10  intimidated by Petitioner.  (RT 914:13-24.)  The note was about three lines long

11  and said "something like your spouse is very proud of you."  (RT 914:25-915:8.)

12  Elsie gave Petitioner the note and he took it away.  (RT 915:9-12.)

13       Petitioner testified that on March 6, 2001, he and Elsie went out on their

14  first date.  (RT 1535:16-1536:3.)  The following Friday, Elsie gave Petitioner some

15  letters, which Petitioner took home.  (RT 1536:11-12.)  Petitioner shredded the

16  letters at home to prevent his wife from finding them.  (RT 1536:13-28.)  That

17  same evening, his wife called him and asked who had been writing letters to him

18  at work.  (RT 1537:1-22.)  When Petitioner came home, he found that his wife

19  had left photocopies of the letters on the kitchen counter.  (RT 1537:25-1538:5.)

20  Petitioner could identify the original letters because "you could see the lines

21  where the shredder had gone through."  (RT 1538:6-11.)  He and his wife argued

22  about the letters.  (RT 1538:18-20.)

23       Gardena Police Detective Mary Celeste Coates, who testified for the

24  defense, obtained a letter that Elsie had handwritten and had her fill out a

25  Gardena handwriting exemplar in Detective Coates's presence.  (RT 1506:5-11,

26  1511:11-1512:9, 1514:21-1515:25.)  From Southwest Offset Printing manager

27  Rick West, Detective Coates obtained a United States Department of Justice

28  immigration and naturalization form and an employment application.  (RT



15

1515:26-1516:17.)  Additionally, Detective Coates dictated from the shredded
papers and had Elsie handwrite four letters while Detective Coates watched.  (RT
1516:22-1518:26.)  Detective Coates sent the shredded letters and the exemplars
to a handwriting expert, Barbara Torres, at the Los Angeles County Sheriff's
crime laboratory.  (RT 1521:27-1522:8.)

Torres testified that no determination could be reached as to authorship of
one of the shredded letters.  (RT 956:1-957:5, 2116:8-19.)  However, Torres
opined that the other shredded letter probably was not written by the same
person who wrote the exemplars.  (RT 2116:20-22.)  Further, Torres believed the
two shredded letters probably were not written by the same person because there
were "numerous areas of disagreement in the characteristics in the writings."  (RT
2116:26-2117:7.)  Elsie denied writing the two shredded letters.  (RT 955:27-
957:5.)

During his closing argument, the prosecutor spoke about the letters:

> [¶]  *One would think that if he put them in the shredder, his wife*
> *found them that day, she taped them back together and she gave*
> *them back to him we would have heard from the wife.  We didn't.*

(RT 2435:5-2436:4 (emphasis added).)

### DNA Evidence

Elsie testified that on May 21, 2001, Petitioner took her in his car to a
parking lot and sexually assaulted her.  (RT 918:25-921:18, 924:14-927:19.)
Petitioner put a bed sheet on the ground, forced her to lie down on it, and tried to
perform oral sex on her.  (RT 928:9-27.)  Petitioner's mouth touched her vagina.
(RT 928:28-929:1.)  Petitioner also penetrated her vagina twice with his penis and
had an orgasm.  (RT 929:16-28, 931:27-932:6.)

Petitioner testified that on the evening of the incident, Elsie was the one
who suggested they have sex.  (RT 1564:3-15.)  Elsie asked Petitioner if he had
the blanket they had used before, and Petitioner spread it on the ground of the

16

1 | parking lot at her request. (RT 1567:24-1569:24.) Elsie lay down on the blanket.

2 | (RT 1570:15-17.) Petitioner and Elsie kissed and fondled each other, and Elsie

3 | orally stimulated him. (RT 1571:2-1572:21.) He tried to penetrate her, but did not

4 | and did not ejaculate inside her. (RT 1572:22-1574:25.) Petitioner denied that

5 | Elsie told him she did not want to have sex any time during the encounter. (RT

6 | 1574:27-1575:1.) Petitioner also testified that he had a vasectomy eleven years

7 | prior to the incident. (RT 1804:21-22.)

8 |       Susan Gorba, a sexual assault nurse examiner who examined Elsie on

9 | May 22, 2001, concluded that Elsie's injuries were consistent with Elsie's account

10 | of forced sexual assault. (RT 1202:24-26, 1204:7-25, 1208:3-1212:3.) Gorba

11 | testified that the type of abrasions Elsie had can be caused by the female trying

12 | to force her partner's nonerect penis inside her, but that was not likely. (RT

13 | 1217:6-24.) Also, Gorba testified that semen and saliva are good sources of

14 | DNA material, and that she collected evidence from inside Elsie's vaginal wall

15 | and neck area. (RT 1213:1-1214:3.)

16 |       Detective Coates, a defense witness, testified that an oral swab was

17 | obtained from Petitioner with his consent. (RT 1525:11-16.) That swab and the

18 | swabs taken from Elsie's vaginal area were sent to the Seri laboratory to discern

19 | whether Petitioner left a DNA sample inside of Elsie. (RT 1525:17-1526:23.)

20 |       At a sidebar conference during Detective Coates' testimony, defense

21 | counsel indicated that he received a copy of the results of the DNA tests. (RT

22 | 1526:24-1528:24.) During his closing argument, defense counsel commented on

23 | the prosecution's failure to present evidence of the DNA test results:

24 |       Now, we don't know, because that evidence wasn't presented. We know

25 |       that we don't know what that evidence was, but we certainly know it wasn't

26 |       put into evidence by the people. If there was evidence of [Petitioner's]

27 |       D.N.A. and there's two possible sources of that D.N.A., there's his semen

28 |       and also his saliva that would have been there from the oral copulation.

1       That evidence was never presented.  You can draw your own conclusions

2       from that because that's all you can do.

3  (RT 2452:20-28.)

4       In rebuttal, the prosecutor spoke about DNA evidence:

5       As to the physical evidence collected as to [Elsie], I get back to the

6       concept of every rape victim is different.  There is no ordinary reasonable

7       rape victim.  And with regard to the serology and the sample that was

8       recovered from the vagina of [Elsie], all I say is two things: number one,

9       he had a vasectomy.  He testified to that himself.  ***Number two, both***

10       ***sides have access to evidence, both sides.***  I'm going to leave that to

11       your common sense.  So that in itself does not impeach her testimony in

12       any way, shape or form.

13  (RT 2463:9-18 (emphasis added).)

14      **2. Analysis**

15       Prosecutorial misconduct rises to the level of a constitutional violation only

16  where it "so infected the trial with unfairness as to make the resulting conviction a

17  denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct.

18  2464, 91 L. Ed. 2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637,

19  643, 94 S. Ct. 1868, 1871, 40 L. Ed. 2d 431 (1974)).  Determining whether

20  prosecutorial misconduct occurred during closing argument requires an

21  examination of the entire proceedings so that the prosecutor's remarks may be

22  placed in proper context.  *Boyde v. California*, 494 U.S. 370, 384-85, 110 S. Ct.

23  1190, 108 L. Ed. 2d 316 (1990); *Allen v. Woodford*, 395 F.3d 979, 1010 (9th Cir.),

24  *cert. denied*, 546 U.S. 858 (2005).  In other words, in reviewing this type of claim,

25  a court must "examine the likely effect of the statements in the context in which

26  they were made."  *Turner v. Calderon*, 281 F.3d 851, 868 (9th Cir. 2002);

27  *Sandoval v. Calderon*, 241 F.3d 765, 778 (9th Cir. 2000), *cert. denied*, 534 U.S.

28  847, *and cert. denied*, 534 U.S. 943 (2001).  Generally, prosecutors must be

given wide latitude in their closing arguments to argue reasonable inferences based on the evidence. *Fields v. Brown*, 431 F.3d 1186, 1206 (9th Cir. 2005); *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997); *United States v. McChristian*, 47 F.3d 1499, 1507 (9th Cir. 1995). "[P]rosecutorial misrepresentations . . . are not to be judged as having the same force as an instruction from the court." *Boyd*, 494 U.S. at 384-85 (citation omitted).

In Ground One, Petitioner argues that the prosecutor's statement, "No lawsuit has been filed," was misleading because the prosecutor knew that a civil claim was contemplated and that Elsie had a workers' compensation claim. (Memo at 3.) However, the prosecutor's sentence accurately reflected the testimony. To the extent Petitioner is arguing that the sentence was misleading in the sense that the prosecutor failed to state that Elsie ***contemplated*** filing a civil lawsuit, Petitioner has failed to show how the sentence rendered the trial unfair. The prosecutor referred to "the possibility of a lawsuit." (RT 2433:3.) Elsie testified she was still in contact with Miller and did not yet know whether she would file a civil lawsuit. (RT 969:20-27.) To the extent Petitioner argues that the sentence is misleading because of Elsie's workers' compensation claim, there was no evidence before the jury of a workers compensation claim due to defense counsel's tactical decision. (RT 1501:17-1502:24.) There was nothing misleading about the prosecutor's statement. *See Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1112-13 (9th Cir. 2005), *cert. denied*, 546 U.S. 1110 (2006).

In Ground One, Petitioner also argues the prosecutor committed misconduct in indicating that "an acquittal in the criminal case would not prevent a successful civil suit by [Elsie]." (Memo at 3.) Petitioner argues that, although the statement may be true, the prosecutor failed to mention that a criminal conviction would guarantee a successful civil lawsuit. However, it is defense counsel's burden, not the prosecutor's, to attack the credibility of the prosecution's witness. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Defense counsel



1   argued in closing that Elsie "was playing my client along for a sexual harassment

2   case" and that she went to see her attorney the day after the alleged rape.  (RT

3   2453:12, 2454:14-24.)

4        The prosecutor's arguments at issue in Ground Three were also proper.

5   The prosecutor may comment on Petitioner's failure to present evidence of phone

6   records or DNA evidence.  *See Menendez v. Terhune*, 422 F.3d 1012, 1034 (9th

7   Cir. 2005) (prosecutor may comment on defendant's failure to present evidence

8   in support of a defense theory); *United States v. Mares*, 940 F.2d 455, 461 (9th

9   Cir. 1991) ("The prosecutor may comment on the defendant's failure to present

10  exculpatory evidence, provided that the comments do not call attention to the

11  defendant's own failure to testify. . . . It is common practice for one side to

12  challenge the other to explain to the jury uncomfortable facts and inferences.")

13  (citations omitted); *United States v. Birges*, 723 F.2d 666, 672 (9th Cir.) ("It is

14  neither unusual nor improper for a prosecutor to voice doubt about the veracity of

15  a defendant who has taken the stand."), *cert. denied*, 466 U.S. 943 (1984).

16  Similarly, the prosecutor may comment on Petitioner's failure to call his ex-wife to

17  the stand.  *See United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000) ("A

18  prosecutor's comment on a defendant's failure to call a witness does not shift the

19  burden of proof, and is therefore permissible, as long as the prosecutor does not

20  violate the defendant's Fifth Amendment rights by commenting on the

21  defendant's failure to testify. . . . Here, [the defendant's] Fifth Amendment rights

22  were not implicated because he chose to testify in his own defense.") (citations

23  omitted).

24       Moreover, the trial court instructed jurors that "[s]tatements made by the

25  attorneys during the trial are not evidence" (CALJIC No. 1.02), and the jury "must

26  decide all questions of fact in this case from the evidence received in this trial and

27  not from any other source" (CALJIC No. 1.03).  (CT 115-16.)  The jury

28  instructions reduced any likelihood that the prosecutor's statements "so infected

1    the trial with unfairness as to make the resulting conviction a denial of due

2    process."  *Darden*, 477 U.S. at 182; *Comer v. Schriro*, 480 F.3d 960, 988-89 (9th

3    Cir.) (per curiam) (same), *cert. denied*, 127 S. Ct. 2455 (2007); *Tan*, 413 F.3d at

4    1118; *Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991) (per curiam).

5          There was abundant evidence of Petitioner's guilt.  Gorba, the nurse who

6    examined Elsie, concluded that Elsie's injuries were consistent with her account

7    of nonconsensual sexual assault.  (RT 1202:24-26, 1204:7-25, 1208:3-1212:3.)

8    Further, Gorba testified that the type of abrasions Elsie had are not likely to be

9    caused by the female trying to force her partner's nonerect penis inside her.  (RT

10   1217:6-24.)

11         The testimonies of other witnesses cast doubt on Petitioner's credibility.

12   Petitioner testified that in the early morning of March 7, 2001, he and Elsie stayed

13   at the Towne Motel.  (RT 1547:27-1550:17.)  Petitioner testified that he filled out a

14   registration card when they checked in but did not receive a receipt.  (RT

15   1553:27-1555:7.)  In a taped interview, Petitioner indicated that he registered in

16   his own name.  (SCT 14:11-22.)[9]  However, Jash Bhagat, the manager of the

17   Towne Motel, testified that he checked the registration cards for March 2001 and

18   there were none for Richard Churchwell.  (RT 2104:14-2105:11.)  The prosecutor

19   pointed to Petitioner and asked Bhagat whether Petitioner was at the motel in

20   March 2001, and Bhagat stated "No." (RT 2105:12-17.)  Additionally, Petitioner

21   testified that Elsie gave him the two love letters he put in the shredder.  (RT

22   1536:11-28.)  Elsie, on the other hand, admitted writing a note but denied writing

23   the two letters.  (RT 955:27-957:5.)  Torres, the handwriting expert, opined that

24   one of the letters probably was not written by the same person who wrote the

25   exemplars and the two letters probably were not written by the same person.  (RT

26   2116:20-2117:7.)

27

28   [9] "SCT" refers to the Supplemental Clerk's Transcript.

By contrast, witnesses who saw Elsie on the day of the incident lent credence to her testimony.  Jerry Babcock, one of Elsie's coworkers who was working on May 22, 2001, testified that he received a phone call from Eddie Harris, another coworker, who told him that Elsie was outside and was "in trouble."  (RT 623:5-8, 626:27-628:12.)  When Babcock went outside, he saw Elsie "crying and in a big way.  Her hair was all messed up and the front of her blouse was completely open."  (RT 628:28-629:6.)  Babcock testified that Elsie said "Rick raped her."  (RT 629:7-9.)  Harris testified that he was home at approximately 2:00 a.m to 2:30 a.m on May 22, 2001, when Elsie called him, sounding hysterical, and told him she had just been raped.  (RT 677:12-26.)  When Harris drove to where Elsie was, "she was crying and . . . was pretty hysterical saying that Rick had raped her."  (RT 678:18-24.)  Recinos also testified that Elsie was "crying and her hair was messed up."  (RT 656:4-7.)  Mark Batungbacal, a police officer who responded to the police call, testified that Elsie "seemed upset. . . . [I]t looked as though the top portion of her blouse had been torn open.  It looked like part of her makeup had been running.  It looked like she had been crying.  She cried on and off."  (RT 684:13-18.)

Accordingly, the state court's denial of Ground One was neither contrary to, nor an unreasonable application of, clearly established federal law.  Petitioner's claims under Grounds One and Three fail.

## B.  GROUND TWO: *Brady* Claim

In Ground Two, Petitioner argues the prosecutor violated *Brady* by: (1) withholding evidence until mid-trial that Elsie had consulted with a civil attorney, (2) withholding evidence until mid-trial that Elsie had a workers' compensation claim, and (3) withholding evidence that Elsie had sued a company in the past for damages.  (Memo at 6.)  Petitioner's arguments are without merit.

## 1. Factual Background

During defense counsel's closing argument, the following exchange occurred regarding Elsie's consultation with Miller:

> [Defense counsel]: Now, we didn't bring in Mr. Miller as a witness to tell you that Elsie had gone to see him. **The truth is, we didn't know about Mr. Miller until way late in the game.**
>
> [The prosecutor]: Objection.
>
> The Court: Sustained. [¶] **There's no evidence. We didn't hear any evidence of that.**

(RT 2454:2-9 (emphasis added).) The exchange regarding Elsie's workers compensation claim is set forth under Grounds One and Three. (RT 1501:17-1502:24.)

## 2. Analysis

Under *Brady*, the prosecution's willful or inadvertent suppression of evidence favorable to a criminal defendant violates due process when the evidence is material to guilt or punishment. *Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004); *Brady*, 373 U.S. at 87. Evidence may be favorable to a criminal defendant if it is either exculpatory or impeaching. *Banks*, 540 U.S. at 691; *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S. Ct. 2188, 165 L. Ed. 2d 269 (2006); *Strickler*, 527 U.S. at 280. The petitioner has the "burden of showing that withheld evidence is material[,]" *United States v. Si*, 343 F.3d 1116, 1122 (9th Cir. 2003); *United States v. Zuno-Arce*, 44 F.3d 1420, 1425 (9th Cir.), *cert. denied*, 516 U.S. 945 (1995), and the court must assess whether the withheld evidence is material "in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L.

1    Ed. 2d 342 (1976) (footnote omitted); *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th

2    Cir.), *cert. denied*, 537 U.S. 942 (2002).

3        Here, the trial court found there was no evidence the defense "didn't know

4    about Mr. Miller until way late in the game," and Petitioner has not presented

5    "clear and convincing evidence to the contrary." *Mitleider*, 391 F.3d at 1046; *see*

6    *also Miller-El*, 537 U.S. at 340. At no time just before, after, or during Miller's

7    testimony did defense counsel complain that disclosure of information regarding

8    Miller was untimely. (RT 901-06.) Petitioner's claim that the prosecution withheld

9    evidence until mid-trial that Elsie had consulted with Miller must fail because

10    there is no factual support for it. *See United States v. Dupuy*, 760 F.2d 1492,

11    1501 n.5 (9th Cir. 1985) ("[S]uppression by the Government is a necessary

12    element of a *Brady* claim."); *United States v. Bracy*, 67 F.3d 1421, 1428-429 (9th

13    Cir. 1995) (same).

14        There is no support for Petitioner's claim that the prosecution withheld the

15    workers' compensation claim. The prosecutor disclosed the workers

16    compensation claim the same day he learned of it. (RT 1502:3-17.) The

17    defense, as a matter of tactics, decided not to put evidence of the claim before

18    the jury. (RT 1501:17-1502:24.) "*Brady* does not necessarily require that the

19    prosecution turn over exculpatory material *before* trial. To escape the *Brady*

20    sanction, disclosure 'must be made at a time when disclosure would be of value

21    to the accused.'" *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988)

22    (emphasis in original) (citation omitted); *see United States v. Anderson*, 391 F.3d

23    970, 975 (9th Cir. 2004) (no *Brady* violation by government's delay in identifying

24    two witnesses when defense had opportunity to recall witnesses who could have

25    been impeached); *United States v. Manning*, 56 F.3d 1188, 1198 (9th Cir. 1995)

26    (no prejudice from government's production of a letter to defense after trial

27

28



1   commenced).  Given that the workers compensation claim did not come before

2   the jury due to defense counsel's strategy, no *Brady* violation occurred.

3        Finally, Petitioner argues that a deposition of Elsie taken by Southwest

4   Offset Printing in Elsie's civil suit, which she filed two days after Petitioner was

5   convicted, shows that she had sued a company in the past for damages.  (Memo

6   at 6.)  However, Petitioner cannot show any evidence that the prosecutor knew

7   about a prior lawsuit filed by Elsie.  *See United States v. Zuno-Arce*, 339 F.3d

8   886, 891 (9th Cir. 2003), *cert. denied*, 540 U.S. 1208 (2004).  Moreover, the jury

9   heard testimony that Elsie was contemplating a civil lawsuit for sexual

10  harassment and convicted Petitioner.  (RT 969:20-27.)  Under these

11  circumstances, evidence about a prior unrelated lawsuit would be immaterial

12  because it would not have made any difference.  *Id.*

13       The California Supreme Court's denial of Ground Two was neither contrary

14  to, nor an unreasonable application of, clearly established federal law.

15       **C.  GROUND FOUR: Failure to Present All Relevant Phone Records**

16       In Ground Four, Petitioner argues counsel was ineffective for failing to

17  investigate and introduce phone records that show Petitioner made four more

18  calls to Elsie than the seven calls admitted at trial.  This ground is without merit.

19       To succeed on a claim of ineffective assistance of trial counsel, a habeas

20  petitioner must demonstrate his attorney's performance was deficient and that the

21  deficient performance prejudiced the defense.  *Williams v. Taylor*, 529 U.S. 362,

22  390, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); *Strickland v. Washington*, 466

23  U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  The petitioner bears the

24  burden of establishing both components.  *Williams*, 529 U.S. at 390-91; *Smith v.*

25  *Robbins*, 528 U.S. 259, 285-86, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).

26  "Deficient performance is performance which is objectively unreasonable under

27  prevailing professional norms."  *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir.

28

1    1990) (citing *Strickland*, 466 U.S. at 688).  Prejudice "focuses on the question

2    whether counsel's deficient performance renders the results of the trial unreliable

3    or the proceeding fundamentally unfair."  *Lockhart v. Fretwell*, 506 U.S. 364, 372,

4    113 S. Ct. 838, 122 L. Ed. 2d 180 (1993) (citations omitted); *Williams*, 529 U.S. at

5    393 n.17.

6        To establish deficient performance, petitioner must show his counsel

7    "made errors so serious that counsel was not functioning as the 'counsel'

8    guaranteed the defendant by the Sixth Amendment."  *Strickland*, 466 U.S. at 687;

9    *Lankford v. Arave*, 468 F.3d 578, 583 (9th Cir. 2006), *cert. denied*, 128 S. Ct. 206

10    (2007).  In reviewing trial counsel's performance, the court will "strongly

11    presume[] [that counsel] rendered adequate assistance and made all significant

12    decisions in the exercise of reasonable professional judgment."  *Strickland*, 466

13    U.S. at 690; *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S. Ct. 2574, 91 L.

14    Ed. 2d 305 (1986).  Only if counsel's acts and omissions, examined in the context

15    of surrounding circumstances, were outside the "wide range" of professionally

16    competent assistance, will petitioner meet this initial burden.  *Kimmelman*, 477

17    U.S. at 386; *Strickland*, 466 U.S. at 690.

18        If petitioner makes this showing, he must then establish there is a

19    "reasonable probability that, but for counsel's unprofessional errors, the result of

20    the proceeding would have been different."  *Strickland*, 466 U.S. at 694; *Williams*,

21    529 U.S. at 391.  The errors must not merely undermine confidence in the

22    outcome of the trial, but must result in a proceeding that was fundamentally

23    unfair.  *Williams*, 529 U.S. at 393 n.17; *Lockhart*, 506 U.S. at 369.  However, a

24    court need not determine whether counsel's performance was deficient before

25    determining whether the defendant suffered prejudice as the result of the alleged

26    deficiencies.  *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an

27

28



26

1   ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course

2   should be followed.").[10]

3        Here, Petitioner cannot demonstrate any deficiency or prejudice.

4   Petitioner's defense was that he and Elsie had a romantic relationship.  (RT

5   1539:15-1540:11, 1543:12-24.).  As discussed in part IV.A, the defense

6   introduced Elsie's phone records showing seven calls made to Petitioner from

7   Elsie's phone.  (RT 1503:19-1505:4; CT 79-80.)  Elsie testified that she spoke to

8   Petitioner twice.  (RT 917:23-27.)  The prosecutor asked whether Elsie had called

9   Petitioner on another occasion, and she replied, "No, twice.  But once he wasn't

10  there," so she hung up that time.  (RT 918:20-24.)  Defense counsel argued to

11  the jury that the discrepancy between Elsie's testimony and her own phone

12  records was too big, and that Cisneros' testimony that she called Petitioner about

13  three times from Elsie's phone was not believable.  (RT 2440:27-2441:27.)

14        Petitioner argues that defense counsel should have offered into evidence

15  Petitioner's phone records, which would have shown that he called Elsie on four

16  occasions.  (Petition at 5.)   However, phone calls *from* Petitioner to Elsie would

17  be ambiguous at best, and could be used to corroborate harassment by

18  Petitioner.  *See Darden v. Wainwright*, 477 U.S. 168, 186-87, 106 S. Ct. 2464, 91

19  L. Ed. 2d 144 (1986) (petitioner did not overcome presumption of sound trial

20  strategy when counsel failed to introduce evidence that had potential to hurt as

21  well as help defense); *see also Lankford*, 468 F.3d at 583.  Petitioner cannot

22  establish a reasonable probability that the result of the trial would have been

23  different had his counsel introduced evidence of the four phone calls in

24  Petitioner's phone records.  The jury was presented with the stronger

25

26

27        [10]  This standard also applies to Grounds Six, Eight, Ten, and Eleven, all of

28  which are ineffective assistance of counsel claims.



27

1    impeachment evidence of Elsie's own phone records. *Strickland*, 466 U.S. at

2    694; *Williams*, 529 U.S. at 391.

3         The California Supreme Court's denial of Ground Four was neither

4    contrary to, nor an unreasonable application of, clearly established federal law

5    **D.  GROUND SIX: <u>Failure to Object to Closing Argument and Ask for</u>**

6          **<u>Continuance</u>**

7         In Ground Six, Petitioner argued defense counsel provided ineffective

8    assistance by failing to: (1) object to prosecutor misconduct in closing argument,

9    (2) ask for continuance after untimely disclosure of Elsie's workers compensation

10   claim, and (3) introduce Petitioner's phone records.[11]

11        Petitioner has not identified the portion of closing argument to which

12   defense counsel failed to object and is therefore not entitled to relief.  (Petition at

13   6; Memo at 17-18; Reply at 11-12.) *James v. Borg*, 24 F.3d 20, 26 (9th Cir.)

14   ("Conclusory allegations which are not supported by a statement of specific facts

15   do not warrant habeas relief.") (citation omitted), *cert. denied*, 513 U.S. 935

16   (1994).  To the extent Petitioner refers to the portions of closing argument at

17   issue in Grounds One and Three, defense counsel is not ineffective for failing to

18   raise an unmeritorious objection. *Strickland*, 466 U.S. at 687.  To the extent this

19   claim is based on defense counsel's failure to object to the prosecutor's

20   comments about a potential civil suit, it is identical to Ground Eight and is without

21   merit as discussed in part IV.E. (*See infra.* at 29.)  To the extent this ground is

22   based on failure to seek a continuance regarding the workers compensation

23   claim, it is without merit as discussed in claim 8 of Ground Ten in part IV.F. (*See*

24   *infra* at 35.)

25

26

27        [11]  This claim is identical to Ground Four and will not be addressed

28   separately.



**E.  GROUND EIGHT: <u>Failure to Object to Comments Regarding</u>**
**<u>Potential Civil Suit</u>**

In Ground Eight, Petitioner claims that he received ineffective assistance of counsel because defense counsel failed to object when the prosecutor stated in closing argument that an acquittal would not prevent a successful civil suit by Elsie without mentioning that a conviction would guarantee Elsie's success. (Petition at 7.)  The factual basis for this argument is the same as in Ground One. (Memo at 20.)

The California Court of Appeal rejected Petitioner's claim, as follows:

> Assuming counsel should have reacted more decisively to the
> prosecution's argument, [Petitioner] does not establish prejudice from
> counsel's failure to do so.  There is no reason to believe the jury
> considered the effect of a conviction or acquittal on recovery in a civil
> action based on the offenses.  And to have one do so would have violated
> instructions to decide the case solely on the evidence.  (CALJIC No. 1.03.)

*Churchwell*, 2003 WL 21054793 at *5.

The California Court of Appeal's denial of Ground Eight was neither contrary to, nor an unreasonable application of, clearly established federal law. *Strickland*, 466 U.S. at 697; *Allen*, 395 F.3d at 999.  Petitioner cannot show there is a reasonable probability that the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 391.  Although Petitioner argues that Elsie's contemplated civil suit gave her a financial motive to lie, the jury was presented with that evidence.  Moreover, the jury is presumed to follow instructions.  *Francis v. Franklin*, 471 U.S. 307, 324, 324 n.9, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985).  There is no reason to believe the jury tailored its verdict to affect the outcome of a civil suit.

## F.  GROUND TEN: Failure to Present Exculpatory Evidence

In Ground Ten, Petitioner argues counsel was ineffective for failing to investigate and present exculpatory evidence.  Specifically, Petitioner complains that defense counsel did not: (1) present DNA evidence; (2) insist on DNA testing of a bite mark or obtain a dental expert; (3) call psychologist Fischer; (4) call Dr. Gabaeff, who was court-appointed; (5) present prior medical evidence that Petitioner's back problems would limit activity; (6) obtain and present a full set of telephone bills concerning Petitioner and Elsie;[12] (7) obtain valid handwriting samples from Elsie; and (8) stress the importance of the workers' compensation claim.  (Petition at 7.)

The California Supreme Court's denial of Ground Ten was neither contrary to, nor an unreasonable application of, clearly established federal law.

### 1.  Failure to Present DNA Evidence

As discussed in part IV.A, defense counsel stated that he received a copy of the DNA test results.  (RT 1528:1-14.)  Neither the prosecutor nor defense introduced the DNA test results into evidence.  Petitioner has failed to show deficiency or prejudice.  Although Petitioner characterizes the DNA results as exculpatory, Petitioner does not describe how the results were exculpatory.[13]

---

[12]  This claim is identical to Ground Four and is without merit as discussed in part IV.C.  (*See supra* at 25.)

[13]  The DNA results excluded Petitioner as a donor of the sperm.  (LD 20 at 76.)  However, Petitioner testified that he had a vasectomy eleven years earlier.  (RT 1804:21-22.)  On the other hand, the DNA results did *not* exclude Petitioner as a donor of the epithelial DNA fraction of the vaginal swab.  (LD 20 at 76, 80.)  *See LaFevers v. Gibson*, 182 F.3d 705, 722 (10th Cir. 1999) (counsel not ineffective in failing to request DNA test where "even favorable DNA test results would not [have made] a difference in [the] case"); *Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998) (no prejudice because "even if Ortiz's attorney had succeeded in disproving all evidence of strangulation, the result of the proceeding would not have been different"), *cert. denied*, 526 U.S. 1123 (1999) (citation omitted).



1  Petitioner has failed to show a reasonable probability that the result of the

2  proceeding would have been different.  Defense counsel reasonably may have

3  concluded that the better strategy was to argue in closing that the prosecution,

4  which had the burden of proof beyond a reasonable doubt, did not introduce the

5  DNA test results into evidence.  (RT 2452:17-28.)  *Guam v. Santos*, 741 F.2d

6  1167, 1169 (9th Cir. 1984) ("tactical decision by counsel with which the defendant

7  disagrees cannot form the basis of a claim of ineffective assistance of counsel")

8  (quoting *Strickland*, 466 U.S. at 690)).

9        **2.   Failure to Present Evidence Regarding Bite Mark**

10        During cross-examination, Elsie testified that Petitioner bit her neck and

11  possibly her right upper chest.  (RT 930:26-931:7.)  Gorba testified that Elsie had

12  "two linear shaped abrasions on her right upper chest about one centimeter in

13  length." (RT 1206:8-20.)  Gorba testified that these abrasions could have been

14  formed a day prior to the incident, but did not believe they were two days old.

15  (RT 1214:21-1215:3.)

16        Petitioner contends that counsel was ineffective for failure to call a dental

17  expert.  However, Petitioner has failed to show that an "expert" was willing to

18  testify that the bite mark was not Petitioner's, and that such an expert was

19  available for the trial.  *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997)

20  ("Speculation about what an expert could have said is not enough to establish

21  prejudice."); *see also Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001)

22  ("[Petitioner] offered no evidence that an arson expert would have testified on his

23  behalf at trial.  He merely speculates that such an expert could be found.  Such

24  speculation, however, is insufficient to establish prejudice.") (citation omitted).

25  Further, defense counsel's closing argument suggests he reasonably believed

26  the bite mark was not inconsistent with Petitioner's defense of consensual sex.

27  (RT 2444:2-7.)  *See Nazarenus v. United States*, 69 F.3d 1391, 1394-395 (8th

28

1  Cir. 1995) (failure to object to DNA evidence, which showed recent sexual contact

2  between alleged victim and petitioner, was not professionally unreasonable in a

3  sexual assault case where the defense was consent); *Santos*, 741 F.2d at 1169.

4      **3-4. Failure to Call Psychologist Fischer and Dr. Gabaeff**

5        To show that counsel was ineffective for failing to call a witness, a habeas

6  petitioner must indicate what the witness would have testified to, and explain how

7  that testimony would have altered the outcome of the trial. *See United States v.*

8  *Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) ("[Defendant] offers no indication of

9  what these witnesses would have testified to, or how their testimony might have

10  changed the outcome of the hearing. Thus, [defendant] has not demonstrated

11  that he was prejudiced by counsel's actions, because he has not shown that the

12  allegedly deficient performance created a reasonable probability that the result of

13  the proceeding would have been different.") (citation, internal quotation marks

14  and brackets omitted). In addition, a habeas petitioner must show that the

15  witness was actually available and willing to testify. *United States v. Harden*, 846

16  F.2d 1229, 1231-32 (9th Cir. 1988), *cert. denied*, 488 U.S. 910 (1988). Generally,

17  these requirements are satisfied with an affidavit from the witness. *See Dows v.*

18  *Wood*, 211 F.3d 480, 486 (9th Cir. 2000), *cert. denied*, 531 U.S. 908 (2000).

19        Here, Petitioner has failed to make any showing as to Dr. Fischer's

20  availability at trial, what he would have testified to, and how that testimony would

21  have created a reasonable probability that the result would have been different.

22  *Id*. at 486; *Harden*, 846 F.2d at 1231-32. Similarly, Petitioner has not

23  demonstrated that defense counsel was ineffective in failing to call Dr. Gabaeff

24  because Petitioner has not shown Dr. Gabaeff was available to testify, what he

25  would have testified to, and how that testimony would have created a reasonable

26  ///

27  ///

28

1  probability that the result would have been different.[14]  *Dows*, 211 F.3d at 486;

2  *Harden*, 846 F.2d at 1231-32.

3  **5.  Failure to Present Evidence Concerning Petitioner's Back**

4  **Problems**

5  In a declaration submitted to the California Supreme Court, Petitioner stated

6  that he has degenerative disk disease and arthritis of the spine that limits his

7  physical activity. (LD 20, Exh. 3 at 64:24-65:8.) He stated that his attorney could

8  have relied on medical records, a six-inch scar at the base of Petitioner's spine

9  from surgery, and family members to show that Petitioner had these conditions.

10  (*Id.*)

11  Petitioner's claim fails because Petitioner has not explained how these

12  medical conditions limited his actions on the night of the incident.  *See Turner v.*

13  *Calderon*, 281 F.3d 851, 895 (9th Cir. 2002) (allegations of petitioner that his

14  counsel was ineffective did not provide basis for federal habeas corpus relief

15  where petitioner did not adequately plead, provide factual support for, or explain

16  how claims warranted relief).  Petitioner testified that after Elsie lay down on the

17  blanket, he and Elsie kissed while he was in a kneeling position. (RT 1570:15-

18  25.) Petitioner later testified that he could not get on top of Elsie because she

19  had her knees up and her pants were in the way. (RT 1573:2-19.)

20

21

22

23

24

25

26

27

28

---

[14]  The state habeas record contains a letter to the prosecutor from defense counsel, who indicated that Dr. Gabaeff "told me that those injuries would be equally consistent with a consensual encounter, but he would like to see the full examination report." (LD 10, Exh. 10.)  There is no indication that Dr. Gabaeff saw the full examination report, or that his opinion would be favorable to Petitioner after doing so.  Moreover, Gorba (the sexual assault nurse examiner who examined Elsie) testified that Elsie's injuries could be caused by something other than a forced sexual assault. (RT 1202:24-1203:12, 1204:2-6, 1211:18-24, 1216:16-19, 1217:22-24, 1218:8-12.)  There is no reasonable probability that the result would have been different even had Dr. Gabaeff testified.



1    Defense counsel was not ineffective because he reasonably could have

2    decided that attributing the unsuccessful penetration to back problems instead of

3    the reasons Petitioner himself cited in his testimony would not have been credible

4    and therefore was not a worthwhile strategy.  The Court applies "a heavy

5    measure of deference to counsel's judgments."  *See Strickland*, 466 U.S. at 691.

6    Pursuit of conflicting theories before the jury would have undermined any chance

7    of acquittal.  *Turk v. White*, 116 F.3d 1264, 1266 (9th Cir. 1997) (counsel was not

8    deficient in failing to present conflicting defense), *cert. denied*, 522 U.S. 1125

9    (1998).

10       **7.    Failure to Obtain Handwriting Samples From Elsie**

11       Petitioner argues that counsel was ineffective for failing to obtain

12    handwriting samples from Elsie and a handwriting expert.  There were numerous

13    handwriting samples in the record: a letter that Elsie brought Detective Coates

14    (RT 1511:11-1512:9), a Gardena handwriting exemplar that Elsie filled out in

15    Detective Coates' presence (RT 1514:21-1515:25), a United States Department

16    of Justice immigration and naturalization form and an employment application

17    obtained from Southwest Offset Printing manager Rick West (RT 653:20-654:4,

18    1515:26-1516:17), and four letters Elsie wrote from Detective Coates' dictations

19    (RT 1516:22-1518:26).  Petitioner makes no showing that these samples were

20    not adequate.  Defense counsel was not ineffective in failing to obtain cumulative

21    evidence.  *See Pizzuto v. Arave*, 280 F.3d 949, 959 (9th Cir. 2002) (no prejudice

22    where evidence trial counsel failed to present was cumulative), *as amended*, 385

23    F.3d 1247 (9th Cir. 2004), *cert. denied*, 546 U.S. 976 (2005).

24       Petitioner has failed to show that a handwriting expert was willing to testify

25    and provide favorable testimony.  *See Grisby*, 130 F.3d at 373 ("Speculation

26    about what an expert could have said is not enough to establish prejudice.");

27    *Wildman*, 261 F.3d at 839 ("[Petitioner] offered no evidence that an arson expert

28

1   would have testified on his behalf at trial.  He merely speculates that such an

2   expert could be found.  Such speculation, however, is insufficient to establish

3   prejudice.") (citation omitted).

4        **8.    Failure to Stress Importance of the Workers' Compensation Claim**

5        Defense counsel made the tactical decision not to present evidence of

6   Elsie's workers' compensation claim.  (RT 1501:17-1502:24.)  Elsie stopped

7   working after the incident and started seeing a psychotherapist.  *(Id.)*  Petitioner

8   argues that counsel was ineffective because the workers compensation claim

9   provides Elsie with a financial motive to lie.  Defense counsel's decision was not

10  unreasonable because evidence of Elsie's workers' compensation claim would

11  have also hurt the defense in that it would have corroborated Elsie's testimony.

12  *See Schardt v. Payne*, 414 F.3d 1025, 1031 (9th Cir. 2005) (no ineffective

13  assistance where the evidence defense counsel did not present might have been

14  harmful to petitioner's defense); *Callins v. Collins*, 998 F.2d 269, 278 (5th Cir.

15  1993) (no prejudice where the evidence trial counsel failed to present "cut[] both

16  ways"), *cert. denied*, 510 U.S. 1141 (1994).  For this reason, Petitioner has failed

17  to establish how obtaining a continuance based on the workers compensation

18  claim would have helped his defense.

19       Petitioner cannot show a reasonable probability that the result would have

20  been different.  *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 391.  The jury

21  heard evidence about a contemplated civil lawsuit and argument about Elsie's

22  financial motive to lie.  (RT 969:20-27, 2453:10-12.)

23       **G.    GROUND ELEVEN: Failure to Object to Hearsay Evidence, Cross-**

24                 **Examine, Ask for Continuance, and Impeach**

25       In Ground Eleven, Petitioner contends he received ineffective assistance of

26  counsel because trial counsel failed to: (1) object to hearsay evidence of prior

27  bad acts of sexual harassment, (2) cross-examine Miller about the collateral

28



estoppel effect of a criminal conviction on a civil case, (3) ask for a continuance regarding Miller's testimony, (4) impeach Elsie's husband with a prior felony conviction, and (5) object to fresh complaint hearsay. (Petition at 8.) These claims lack merit.

The California Supreme Court's denial of Ground Eleven was neither contrary to, nor an unreasonable application of, clearly established federal law.

### 1.    Failure to Object to Hearsay Evidence of Prior Bad Acts

The California Court of Appeal rejected Petitioner's claim that counsel was ineffective in failing to object to evidence of workplace interaction between Petitioner and Elsie on the basis of hearsay.  It stated, in pertinent part, the following:

> It appears that a hearsay objection to some of the testimony would have had merit, but [Petitioner] does not convince us that material portions of the testimony were inadmissible on any ground.  [¶]  Second, [Petitioner] fails to establish the absence of a tactical reason for trial counsel's decision not to object to the testimony.  The defense theory was that Elsie falsely accused [Petitioner] and that, as [Petitioner] testified, sexual contact between the two was consensual and part of a romantic relationship.  The defense also argued that Elsie had a financial motive for a false accusation because evidence showed that she was considering a civil action for sexual harassment based on [Petitioner's] conduct prior to the offenses.  [¶]  Trial counsel could reasonably have believed evidence of a sexual element in the relationship between [Petitioner] and Elsie as revealed by her coworkers would support this defense theory, and that objections to the testimony would have been counterproductive.  In fact, trial counsel stated during trial that he was not objecting to certain hearsay testimony from coworkers "as a matter of tactics."  Also, the defense relied heavily on



1    another coworker witness, Rosa Valdez, whose testimony was subject to
2    similar admissibility issues as testimony by the prosecution witnesses.
3    Counsel may have refrained from objecting to prosecution evidence in
4    order to improve the likelihood that testimony by Valdez would be admitted.
5    *Churchwell*, 2003 WL 21054793 at *3.
6        The Court of Appeal was not convinced that "material portions of the
7    testimony were inadmissible on any ground," and this Court must accept its
8    interpretation of the state hearsay rule. *See Bradshaw v. Richey*, 546 U.S. 74,
9    76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (per curiam) ("[A] state court's
10   interpretation of state law, including one announced on direct appeal of the
11   challenged conviction, binds a federal court sitting in habeas corpus.") (citations
12   omitted); *Hicks on behalf of Feiock v. Feiock*, 485 U.S. 624, 629-30 n.3, 108 S.
13   Ct. 1423, 99 L. Ed. 2d 721 (1988) (same).  Since defense counsel would not have
14   been successful if he had objected to the material portions of the testimony,
15   Petitioner has not shown prejudice. *James*, 24 F.3d at 27.
16       Here, the Petition did not specify any statements to which trial counsel
17   should have objected. (Petition at 8; Memo at 21.)  Petitioner's reply brief argued
18   that trial counsel should have objected to testimony that Petitioner called Elsie
19   "my little nigger." (RT 647:5-8.)  However, this statement must be taken in
20   context.  There was testimony that Petitioner was possessive of Elsie and that
21   Petitioner said he "love[d] everything that's chocolate" while stroking Elsie's arm –
22   all of which, as the Court of Appeal noted, could corroborate the defense theory
23   that there was a romantic and sexual relationship between the two of them.  (RT
24   641:4-24, RT 643:5-21; *see also* 626:9-14, 649:11-651:17.)  Defense counsel's
25   tactical decision not to object to the co-workers' testimony was reasonable. (RT
26   644:15-28, 645:9-10, 653:3-10.)  Counsel reasonably could have concluded that
27   evidence of Petitioner's comments indicative of a possessive attitude toward
28

1  Elsie, including ones that contained an otherwise offensive term, could support

2  the defense theory of a consensual sexual relationship.

3       Moreover, as the Court of Appeal reasoned, defense counsel reasonably

4  could have determined that Valdez's testimony, which also contained hearsay

5  statements, was more likely to be admitted if he refrained from objecting to similar

6  prosecution evidence.  Valdez's testimony was particularly important to the

7  defense because she observed Petitioner and Elsie's interaction, and testified

8  that it appeared the two were in a romantic relationship based on specific

9  examples.  (RT 1897:23-28, 1899:1-28, 1900:9-13, 1903:5-18.)  "[A]ll the co-

10 workers were saying that they had a relationship going."  (RT 1900:1-8.)  In short,

11 Petitioner has not shown that defense counsel's failure to object was not a

12 "tactical decision by counsel with which the [he] disagrees."  *Santos*, 741 F.2d at

13 1169.

14      **2.   Failure to Cross-Examine Miller About Collateral Estoppel Effect**

15      Petitioner argues counsel was ineffective for failing to cross-examine Miller

16 about the collateral estoppel effect of a criminal conviction on a civil case.  As

17 discussed above under Ground Eight in part IV.E, the Court of Appeal stated:

18          There is no reason to believe the jury considered the effect of a conviction

19          or acquittal on recovery in a civil action based on the offenses.  And to

20          have one do so would have violated instructions to decide the case solely

21          on the evidence.  (CALJIC No. 1.03.)

22 *Churchwell*, 2003 WL 21054793 at *5.  Petitioner makes no showing that

23 testimony from an attorney about the law of collateral estoppel would have been

24 admissible.  Moreover, Petitioner cannot show there is a reasonable probability

25 that the result of the proceeding would have been different.  *Strickland*, 466 U.S.

26 at 694; *Williams*, 529 U.S. at 391.  Although Petitioner argues that collateral

27 estoppel went to Elsie's financial motive to lie, the jury was presented with

28



1 │ evidence of her contemplated civil suit and counsel's argument.  As discussed

2 │ above, the jury is presumed to follow instructions.  *Francis*, 471 U.S. at 324 & n.9.

3 │ There is no reason to believe the jury tailored its verdict to affect the outcome of a

4 │ civil suit.

5 │       **3.   Failure to Ask for a Continuance Regarding Miller**

6 │       The California Court of Appeal rejected Petitioner's contention that defense

7 │ counsel was ineffective in failing to ask for a continuance when the prosecution

8 │ presented Miller's allegedly "surprise" testimony:  "There is nothing in the record

9 │ establishing late disclosure or, if there was, that a continuance was needed or

10 │ warranted."  *Churchwell*, 2003 WL 21054793 at *5.  As discussed above in part

11 │ IV.B, the trial court found there was no evidence the prosecution did not reveal

12 │ information about Miller "until way late in the game."  (RT 2454:2-9.)  Counsel

13 │ was not ineffective in not requesting a continuance because there was no basis

14 │ for it.  *See United States v. Fish*, 34 F.3d 488, 494-95 (9th Cir. 1994) ("Where a

15 │ motion for a continuance would prove futile, failure to seek one cannot constitute

16 │ ineffective assistance.") (citation omitted).

17 │       **4.   Failure to Impeach Elsie's Husband With a Prior Felony**

18 │           **Conviction**

19 │       Petitioner argues that counsel was ineffective for failing to impeach Elsie's

20 │ husband with a prior felony conviction.  Defense counsel made a tactical decision

21 │ not to use the felony conviction for impeachment purposes.  (RT 2136:14-

22 │ 2137:3.)

23 │       The California Court of Appeal rejected Petitioner's contention:

24 │     . . . [T]he record does not specify the nature of the conviction or whether it

25 │     was admissible for impeachment.  Also, trial counsel reasonably could

26 │     have concluded an attempt to discredit a husband whose wife had either

27 │     been raped or committed adultery would have a negative effect on the jury.



28 │

1    Moreover, counsel could have reasonably concluded that impeaching the
2    husband's testimony would not have been helpful.  Elsie's husband
3    testified that he and Elsie were not separated at the time of the incident.  It
4    is not clear that impeaching this testimony would have undermined Elsie's
5    credibility or added credibility to [Petitioner's] testimony that Elsie told him
6    she was separated.

7  *Churchwell*, 2003 WL 21054793 at *5.

8        Petitioner has not shown that the Court of Appeal's decision was contrary
9  to, or an unreasonable application of, clearly established federal law or an
10  unreasonable determination of the facts.  Defense counsel's strategy in closing
11  argument was to argue that Elsie's behavior after the incident did not make sense
12  and was not consistent with someone who had been sexually assaulted.  An
13  integral part of defense counsel's argument was to portray Rivera, Elsie's
14  husband, as a "nice guy":

15    But she starts walking back to Southwest Printing and then thinks, you
16    know what, I have my cell phone.  I'll call for help, but who does she call?
17    She doesn't call home, and you know, the thing is you saw Elsie's
18    husband come in and testify.  ***He seems like a nice guy.  He seems like***
19    ***a compassionate guy.***  He would have been home at that time.  He told
20    you he goes to work in the morning, but she didn't call him.  She didn't call
21    the police.  She calls Eddie [Harris], a co-worker who, for whatever
22    reason, Eddie calls Jerry [Babcock] and Jerry comes out and finds her. . . .
23    That, ladies and gentlemen, doesn't make sense. . . .

24  (RT 2447:17-28 (emphasis added.)  Had defense counsel impeached Rivera with
25  a prior felony, Elsie's testimony that she did not call her husband because she
26  was "afraid of his reaction" (RT 934:6-10) would have been more credible.
27  Defense counsel was not ineffective.  *See Correll v. Stewart*, 137 F.3d 1404,

28                                        40

1   1411 (9th Cir.) ("[I]t was within the broad range of professionally competent

2   assistance for [petitioner]'s attorney to choose not to present psychiatric evidence

3   which would have contradicted the primary defense theory."), *cert. denied*, 525

4   U.S. 984 (1998).

5       **5.  Failure to Object to Fresh Complaint Hearsay**

6       Petitioner argues that counsel was ineffective for failure to object to fresh

7   complaint hearsay.  The California Court of Appeal explained and rejected

8   Petitioner's argument:

9       Under the fresh complaint rule, a victim's out-of-court disclosure that he or

10      she has been a victim of a crime is admissible for nonhearsay purposes.

11      Evidence is limited to the fact of, and the circumstances surrounding the

12      disclosure of the offense.  The details of the disclosure are inadmissible

13      because the jury may consider details as proof the offense occurred,

14      thereby converting the victim's statement into a hearsay assertion.  [¶]

15      Here, [Petitioner] concedes testimony that Elsie told Batungbacal and

16      Gorba that [Petitioner] raped her is admissible, but attacks counsel's

17      failure to object to admission of details of the rape.  We conclude that trial

18      counsel reasonably could have believed that the testimony was admissible

19      in its entirety.  [¶]  Batungbacal testified that Elsie told him that [Petitioner]

20      took her to the parking lot on the pretext that it was her work location,

21      demanded sex, and threatened her with a box cutter when she refused to

22      submit.  These details are inadmissible under the fresh complaint rule, ***but***

23      ***appear to be admissible as a spontaneous statement***.  An out-of-court

24      statement purporting to describe an event perceived by the declarant is

25      admissible where the statement is made spontaneously while the

26      declarant was under the stress of excitement caused by such perception.

27      Undisputedly, Elsie's statements were made minutes after an occurrence

28

1 Cir. 2005), *cert. denied*, 546 U.S. 1137 (2006). The Court of Appeal also

2 reasonably concluded that, in light of the overwhelming evidence of guilt,

3 Petitioner cannot show he was prejudiced by any alleged deficiency. *Allen*, 395

4 F.3d at 999.

## V.

## RECOMMENDATION

7     For the foregoing reasons, it is recommended that the District Court issue

8 an Order (1) adopting this Report and Recommendation; and (2) directing that

9 judgment be entered denying the Petition and dismissing this action with

10 prejudice.

11

12 Date:  April ⧸ , 2008

13                                  ALICIA G. ROSENBERG
                                   United States Magistrate Judge

## NOTICE

Reports and Recommendations are not appealable to the Court of Appeals, but are subject to the right of any party to file Objections as provided in the Local Rules Governing Duties of Magistrate Judges, and review by the District Judge whose initials appear in the docket number.  No Notice of Appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the Judgment of the District Court.